# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MARCELLO VALLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-14534 |
| v. | ) | |
| | ) | The Hon. Judge Edmond E. Chang |
| CITY OF CHICAGO, ILLINOIS, and | ) | |
| ANNETTE NANCE-HOLT, in her individual | ) | Magistrate Judge Jeffrey T. Gilbert |
| capacity, BRIAN CASEY, in his individual capacity, | ) | |
| PAUL COGSWELL, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS (DKT. 11)

Respectfully submitted,

MARCELLO VALLE

*/s/ Cass T. Casper*

By:_____

Cass T. Casper, Esq.
His Attorney

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: ccasper@dispartilaw.com

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MARCELLO VALLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-14534 |
| v. | ) | |
| | ) | The Hon. Judge Edmond E. Chang |
| CITY OF CHICAGO, ILLINOIS, and | ) | |
| ANNETTE NANCE-HOLT, in her individual | ) | Magistrate Judge Jeffrey T. Gilbert |
| capacity, BRIAN CASEY, in his individual capacity, | ) | |
| PAUL COGSWELL, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## **TABLE OF CONTENTS**

I.    **ARGUMENT** ........................................................................................................ 1

A.    **Plaintiff States A Viable As-Applied And Facial Free Exercise Claim** ................... 1

    1.   Strict Scrutiny Applies And The City Fails To Meet It ...................................... 2

    2.   The City Interprets Plaintiff's Religious Exemption And Complaint Too Narrowly  6

II.   **Plaintiff States A Viable Equal Protection Claim** ...................................................... 7

III.  **Plaintiff Has Properly Pleaded That The City Did Properly Adopt The
Vaccination Policy** ..................................................................................................... 9

IV.   **Plaintiff Has Stated A Viable IRFRA Claim** ......................................................... 16

V.    **The Tort Immunity Act Does Not Bar Plaintiff's Claims** ..................................... 16

    1.   Equitable Relief Is Not Barred By TIA ........................................................... 17

    2.   Damages Are Not Barred Because Of Section 6-104(b)'s "Due Care" Language….18

    3.   Plaintiff's Termination Is Not A Disease Prevention Measure ............................... 19

    4.   IRFRA Claims Are Only Ever Against The Government; Therefore, How Can No
Damages Be Available? ................................................................................... 20

VI.   **The Individual Defendants Are Not Entitled To Qualified Immunity** ................ 22

**CONCLUSION** .........................................................................................................23

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION**

MARCELLO VALLE,                                    )
                                                   )
    Plaintiff,                             )
                                                   )  Case No. 23-cv-14534
v.                                                 )
                                                   )  The Hon. Judge Edmond E. Chang
CITY OF CHICAGO, ILLINOIS, and                     )
ANNETTE NANCE-HOLT, in her individual              )  Magistrate Judge Jeffrey T. Gilbert
capacity, BRIAN CASEY, in his individual capacity, )
PAUL COGSWELL, in his individual capacity,         )
                                                   )
    Defendants.                            )

## **TABLE OF CASES**

5 ILCS 315/15(a)-(b)

745 ILCS 10/6-104

2A *McQuillin's Law of Municipal Corporations* § 10.27

*Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 450 (7th Cir. 2013)

*Armour v. City of Indianapolis*, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012)

*Booth v. Corn Products Co.,* 9 Ill.App.3d 433, 292 N.E.2d 149, 152 (1972)

*Brandon v. Bd. of Educ. of City of St. Louis*, 2023 WL 4104293 (E.D. Mo. 2023)

*Chicago Firefighters Union, et al. v. City of Chicago*, 2021 CH 05715 (J. Moreland)

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)

*City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985)

*E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781–82 (7th Cir. 2007)

Elkouri & Elkouri, *How Arbitration Works*, 203, Sanders and Kennedy, (8th ed. 2020)

*Emp. Div. Dept. of Human Res. Of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990)

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021)

*Garvey v. City of New York*, 2022 NY Slip Op. 22335 (Oct. 24, 2022)

*Gray v. W.A. Black Co.,* 338 Ill. 488, 170 N.E. 713, 716 (1930)

*Halgren v. City of Naperville*, 577 F.Supp.3d 700, 752 (N.D. Ill. 2021)

*Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973)

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022)

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905)

*Joiner, et al. v. The City of Chicago*, 2022 L 3085 (Feb. 24, 2023, J. Roberts)

*Kirley v. Bd. of Educ. of Maine Twp. High Sch. Dist. 207*, No. 13 C 1706, at *12 (N.D. Ill. Dec. 20, 2013)

*Klaasen v. Trustees of Indiana University*, 2021 WL 3073926 at *25, *aff'd*, 7 F.4th 592 (7th Cir. 2021)

*Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 714 (7th Cir.2006)

*Lukaszczyk v. County of Cook*, 47 F.4th 587, 607 (7th Cir. 2022)

*McLaughlin v. Tilendis*, 398 F.2d 287, 290 (7th Cir. 1968)

*Michigan Avenue National Bank v. County of Cook*, 306 Ill.App.3d 392 (2d Dist. 1999)

*Missey v. City of Staunton, Illinois*, 2008 WL 4911877 (C.D. Ill. 2008)

*Moncivaiz v. DeKalb*, No. 03 C 50226, 2004 WL 539994, at *3 (N.D. Ill. 2004)

*PACE, Suburban Bus Div. of Reg. Transp. Auth. v. Reg. Transp. Auth.*, 346 Ill. App. 3d 125, 143 (2003)

*Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010)

*Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)

*Schneider v. City of Chicago*, 22 C 1031, 2023 WL 8019434 (N.D. Ill. Nov. 20, 2023)

*Schultz v. St. Clair County*, 2022 IL 126856 (2022)

*Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584, 34 BNA LA 561, 565, 46 LRRM 2416 (1960)

*Stringer v. City of Lake Forest*, 16 C 8991, 2017 WL 75741, at *1 (N.D. Ill. Jan. 7, 2017)

*Tandon v. Newsom*, 141 S.Ct. 1294, 1296-97 (April 9, 2023)

*Taylor v. Bi-County Health Department*, 2011 IL App (5th) 090475 (5th Dist. 2011)

*Troogstad v. City of Chicago*, 571 F.Supp. 3d 901, 917 (N.D. Ill. 2021)

*Vill. of Thomson v. Ill. Human Rights Comm'n*, 2016 IL App (2d) 160011-U, ¶70, 2016 WL 6903900, at *11.

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MARCELLO VALLE,                                    )
                                                   )
          Plaintiff,                               )
                                                   )   Case No. 23-cv-14534
v.                                                 )
                                                   )   The Hon. Judge Edmond E. Chang
CITY OF CHICAGO, ILLINOIS, and                     )
ANNETTE NANCE-HOLT, in her individual              )   Magistrate Judge Jeffrey T. Gilbert
capacity, BRIAN CASEY, in his individual capacity, )
PAUL COGSWELL, in his individual capacity,         )
                                                   )
          Defendants.                              )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DKT. 11)

MARCELLO VALLE (Plaintiff or Marcello), by and through his undersigned counsel, Cass

T. Casper, DISPARTI LAW GROUP, P.A., responds as follows in opposition to Defendants'

Motion to Dismiss (Motion) (Dkt. 11). For the following reasons, the Motion should be denied in its

entirety.

## ARGUMENT

### I.    Plaintiff States A Viable As-Applied And Facial Free Exercise Claim.[1]

Defendants argue that religiously neutral and generally applicable laws incidentally burdening

religious rights need only be rationally related to a legitimate governmental interest, citing *Fulton v.*

*City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) and *Emp. Div. Dept. of Human Res. Of Oregon v. Smith*,

494 U.S. 872, 878-82 (1990). Dkt. 11 at 4. They claim that a neutral law of general applicability is

constitutional if supported by a rational basis. Dkt. 11 at 5-6. They claim this judicial district has

already decided that the Policy has a rational basis, citing *Troogstad v. City of Chicago*, 571 F.Supp. 3d

---

[1] Plaintiff is making facial and as-applied challenges, but either way classified the analysis in this section should be the same. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (The facial/as-applied distinction "does not control the pleadings.").

901, 917 (N.D. Ill. 2021), *Lukaszczyk v. County of Cook*, 47 F.4th 587, 607 (7th Cir. 2022), and *Klaasen v. Trustees of Indiana University*, 2021 WL 3073926 at *25, *aff'd*, 7 F.4th 592 (7th Cir. 2021). Dkt. 11 at 5. They claim that the policy has a rational basis "due to the severity of the pandemic, including newly discovered variants and the need to prevent the spread of the disease," and that controlling the pandemic depends on developing immunities in all employees who have contact with each other and members of the public. Dkt. 11 at 5. They then argue that Plaintiff was fired for not testing and reporting, rather than not being vaccinated. Dkt. 11 at 6.

      1.  <u>Strict Scrutiny Applies And The City Fails To Meet It.[2]</u>

First, strict scrutiny applies for two reasons. Plaintiff pleads that the policy was "not generally applicable and it selectively burdened Plaintiff because in late 2021 and throughout 2022 numerous fire teams were asked to report their COVID-19 status on the Testing Portal and to be vaccinated" and persons on such teams were not fired, although not having the same religious bases for refusing as Plaintiff. Dkt. 1 at ¶¶31, 46. Strict scrutiny should apply to the policy because it is not generally applicable as a matter of Dkt. 1 at ¶¶31, 46. Beyond that, though, strict scrutiny applies because the amount of scrutiny given to a policy infringing on religious belief should increase as the pandemic wanes as now explained.

The lapse of time and control of the pandemic has undercut the need to terminate Plaintiff. What justifies a policy that, on its face, allows for "disciplinary action up to and including discharge" for noncompliance all throughout the pandemic without requiring any assessment of the need for termination to resolve the concerns that the policy was supposed to solve as the pandemic itself diminishes? Plaintiff was fired on October 25, 2022 on its basis, when the pandemic, at that time, was certainly in its twilight. *See https://www.illinois.gov/news/press-release.25998.html* (ending Illinois' public health emergency as of May 11, 2023); https://www.reuters.com/world/us/new-york-mayor-

---

[2] As discussed in the section on Equal Protection, even if rational basis scrutiny applies this termination still fails it.

ending-covid-vaccine-mandate-city-workers-2023-02-06/ (announcing end to NYC vaccine mandate in February 2023). The City's own data supports that COVID was well under control by September 2022, ranking the community level risk as "low" and a new case rate of .001 percent. *See Chicago Respiratory Weekly Surveillance Report* (Sept. 23, 2022).[3]; *see* Exhibit 1. The City favors a blanket "rational basis" approach regardless of the state of the pandemic and the true need for the policy, when, in fact, the balance of religious rights against government need should be anything but "one size fits all." Thus, Plaintiff urges this Court to look to a sister jurisdiction that has taken just such an approach and endorsed strict scrutiny of these policies in a waning pandemic: *Brandon v. Bd. of Educ. of City of St. Louis*, 2023 WL 4104293 (E.D. Mo. 2023).

In *Brandon*, the Court acknowledged that *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), means that "when faced with a public health crisis, a state may implement measures that infringe on constitutional rights, subject to certain limitations." *Brandon*, 2023 WL 4104293 at *4. The plaintiffs in *Brandon*, though, argued that *Jacobson* did not apply to the policy because the government's policy and actions under it "were not done during a period of a public health crisis necessitating emergency public health initiatives." *Id.* at *5. *Brandon* then cited to an Eighth Circuit case, *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) to say that as the crisis surrounding the pandemic evolved "and time is available for more reasoned and less immediate decision-making by public health officials," heightened scrutiny is justified. *Id.* The *Brandon* court then concludes that whether the *Jacobson* deference applies, or whether "tiers of scrutiny" apply is a "factual determination for the Court." *Id.* The City may say it is not arguing for *Jacobson*-style deference, but rational basis review. But what is important from *Brandon* is that it involves a sister

---

[3] *https://www.chicago.gov/content/dam/city/depts/cdph/H1N1_swine_flu/FluUpdate/2022/Respiratory-Virus-Surveillance-Report_Week-37_09-22-2022.pdf.*

court endorsing the view that, as the pandemic evolves, so should the level of scrutiny involved as to a policy impinging on religious rights.

*Brandon* goes on to endorse strict scrutiny, which is what Plaintiff in this case avers should apply, certainly at least as of October 25, 2022, when the pandemic was, if not winding down, certainly well-aged. *See* Exhibit 4-6 (ending testing, masking, and citing risk level as "low"). A law that burdens religion need not be justified by a compelling government interest if it is neutral and of general applicability. *Smith,* 494 U.S. at 881. If, however, a plaintiff shows that (1) the government has burdened his sincere religious beliefs (2) pursuant to a policy that is not neutral and generally applicable, (3) the government must then "satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 142 S. Ct. at 2421–22 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)); *see also Lukumi*, 508 U.S. at 546.

Moving to the strict scrutiny analysis. The City does not demonstrate a compelling interest and narrow tailoring. There is no question Plaintiff has alleged his religious beliefs were burdened because he was fired for violating the same policy from which he was exempted. Dkt. 1 at ¶¶19-23. Plaintiff has alleged the policy was not generally applicable based on inconsistent application. Dkt. 1 at ¶¶31, 46. Too, it is well-established that a policy allowing for exemptions, such as this one, is not generally applicable. *See Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876 (2021) ("[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable. . ."). Certainly there was a compelling interest early in the pandemic is passing a policy. The issue here is, as of October 25, 2022, was there a compelling interest justifying that section of the policy stating, "Violations of this policy. . .will result in disciplinary action up to and including discharge" and was there a compelling interest in firing Plaintiff using this language as of October 25, 2022? Per the City's actions, when the pandemic was at its height, there was no need to fire Plaintiff, but as the

4

pandemic waned and came under control, there was then a need to fire Plaintiff. "Absurd" is the better way to look at the City's termination here, especially given that it had already ended testing and masking – why fire him at all then if the pandemic was at such a point that the City had already ended testing and masking. *See* Exhibits 4-6.

For its part, the City does not identify a compelling interest *that would justify the termination section of the policy being applied in October 2022*. Indeed, it recycles platitudes about the need to control the pandemic that made sense in in the injunction litigation early on in the pandemic. Dkt. 11 at 5-6. The City, though, does not tell us one single time what justifies terminating Marcello Valle in October 25, 2022 for violating a Policy the City exempted him from, that he has religious objections to, after testing and masking had ended, other than its absurd implication that, somehow, that is the only means it has available to control the pandemic that is, indeed, under control, better understood, and dying down. *See also Garvey v. City of New York*, 2022 NY Slip Op. 22335 (Oct. 24, 2022) ("President Joseph Biden has said that the pandemic is over. The State of New York ended the Covid-19 state of emergency over a month ago.").[4]

As if the City's lack of an articulated justification is not enough, Plaintiff averred a bevy of less restrictive means in his Complaint that Defendants never answer. Dkt. 1 at ¶¶34, 49. Defendants have done nowhere near enough to meet their burden to establish that the *termination* provision of the Policy satisfies strict scrutiny. *See Tandon v. Newsom*, 141 S.Ct. 1294, 1296-97 (April 9, 2023) ("narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID.").

Accordingly, strict scrutiny applies, Plaintiff has adequately stated a free exercise challenge and Defendants' Motion should be denied as to Count 1.

---

[4] https://law.justia.com/cases/new-york/other-courts/2022/2022-ny-slip-op-22335.html

2.  <u>The City Interprets Plaintiff's Religious Exemption And Complaint Too Narrowly.</u>

Defendants also argue that Plaintiff was fired for not complying with the testing reporting requirement, not that he was fired for his religious exemption for the vaccine requirement. Dkt. 11 at 6. However, Plaintiff has pleaded that his religious exemption request and determination asserted "that his bona fide Christian beliefs prevented him from complying with the COVID-19 Policy." Dkt. 1 at ¶17. He pleaded that "Defendants granted Plaintiff's request for a religious exemption," and that the exemption was "to the entire Policy as a whole." Dkt. 1 at ¶21. Looking to Defendants' Exhibit 1, the full Determination Notice, such only requires Plaintiff to comply with "masking, social distancing, and testing requirements," and it says nothing about vaccine status reporting or testing *reporting*. Dkt. 11-1. Being fired for violating the policy from which he was exempted for religious reasons is the heart of his claim, and he has adequately stated a Title VII and IHRA claim on such basis. Plaintiff is allowed to plead the employer's intent generally at the pleadings stage. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781–82 (7th Cir. 2007) (holding religious discrimination plaintiff need only say that the employer held the worker's religion against him); *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998); *see also Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 714 (7th Cir.2006) (holding that a religious discrimination plaintiff need only say that the employer "h[eld] the worker's religion against him"). But anyway, how can the City say that it terminated Plaintiff for not reporting testing, when testing had long since ended? *See* Exhibit 5 (suspending the twice weekly testing requirement). What was there for Plaintiff to report as of October 25, 2022 when he was fired given that weekly testing was suspended? As suggested below, this was a vindictive termination, and not one designed to control any pandemic.

Defendants' argument also rests also on the caveats in the Determination Notice that Plaintiff is to comply with "masking, social distancing, and testing requirements." Dkt. 11-1. Yet, these caveats, too, do not negate Plaintiff's general exemption from complying with the policy as a

whole because, indeed, the policy as a whole never references social distancing, and the policy also states "[a]ll employees must continue to comply with masking, testing, and other safety requirements as outlined in other City policies and directives." Dkt. 1 at 12, §G. The Determination Notice does, indeed, allow the City to require Valle to comply with *other* City policies, including those regarding masking, testing, and social distancing to the extent those do not conflict with his exemption; however, it does not allow the City to fire Plaintiff for failing to comply with the COVID-19 Vaccination Policy, which is what it did here. In any event, the fact that the City had already ended the testing and masking requirement, yet now claims it was the testing reporting requirement, is exactly the kind of shifting and unbelievable explanation that points to Valle's termination really being a pretext for religious exercise discrimination.

Defendants also argue that Plaintiff's exempton request only covered vaccinations, not reporting, and, therefore, his claims fail under the second element that he must bring the religious observance to the employer's attention. Dkt. 11 at 6. Plaintiff's pleading is not that narrow. Plaintiff pleaded that his religious exemption request and determination asserted "that his bona fide Christian beliefs prevented him from complying with the COVID-19 Policy." Dkt. 1 at ¶17. This would encompass all aspects of the City's COVID-19 policy, all of it, from reporting to vaccination. Too, Plaintiff is not required to follow a script in his exemption request, a lesson we learn from Title VII cases. *See Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 450 (7th Cir. 2013) ("Title VII has not been interpreted to require adherence to a rigid script to satisfy the notice requirement."). If the City had questions about the scope of Valle's exemption request, they should have asked him. Defendants' Motion should be denied on this basis.

## II.     Plaintiff States A Viable Equal Protection Claim.

Defendants first argue rational basis applies to Equal Protection challenges. Dkt. 11 at 7-8. They cite *Troogstad*, *Lukaszczyk*, and *Halgren v. City of Naperville*, 577 F.Supp.3d 700, 752 (N.D. Ill.

7

2021), to support rational basis review. Dkt. 11 at 8. They finally claim that the Policy is grounded in medicine and science, and is rationally-related to the City's purpose "of protecting its employees and Chicagoans" from an epidemic of disease. Dkt. 11 at 8. They state the Seventh Circuit says so even if the Policy does not fully account for natural immunity or other studies. Dkt. 111 at 8. They finally argue that the Plaintiff cannot show religious animus. Dkt. 11 at 9.

These arguments were all made by the City as to the Free Exercise claim, and Plaintiff incorporates his arguments from the prior section of this Response here. Dkt. 11 at 7-9. However, *Halgren v. City of Natperville*, 577 F.Supp. 700 (N.D. Ill. 2021) (J. Blakey), has language suggesting that even if rational basis review applies, this termination still fails that review. In *Halgren*, the Court stated that it "remains mindful that this case involves serious implications for personal liberty and public health, and that 'even in a pandemic, the Constitution cannot be put away and forgotten.'" *Id.* at 734. The Court then conducted a rational basis review, recognizing that "[w]ith respect to the rationality of the means to further such end, the Court must discern whether there is a rational factual relationship between the legitimate government interest and the challenged law's approach. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (a challenged law must bear "a rational relation to some legitimate end."); *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018) (citing *Armour v. City of Indianapolis*, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012)). If the law's "relationship to an asserted goal is so attenuated as to render [it] arbitrary or irrational" then the law will be invalidated. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

The problem with the City's Motion, here, is it never explains how a termination in October 25, 2022 rationally supports its interest in controlling the pandemic. Plaintiff was already on non-disciplinary, no-pay status as of that date, so it was not as if he was interacting with the public as a

Firefighter/EMT.[5] How does terminating him advance any pandemic-controlling objective? On its face, the termination is arbitrary, irrational, and Plaintiff wonders if discovery will show that it was even vindictive for him exercising his religious rights? Especially given the City's own data on COVID-19 as of September 2022 (*See* Exhibit 4), terminating Plaintiff as a COVID-19 control measure certainly "exceeds the bounds of rational speculation." *Halgren*, 577 F.Supp. 700 at 745. The vaccine mandate as a whole certainly had a "conceivable basis" sufficient to survive rational basis review, as *Haglren* concluded. But City offers not one iota of argument or fact to show how *termination of Plaintiff in October 2022* is a rational COVID-19 control measure.

### III.   Plaintiff Has Properly Pleaded That The City Did Properly Adopt The Vaccination Policy.

Defendants misunderstand Count 3. Plaintiff is not saying the City has no authority to adopt the Policy. Instead, he is asking: what is this document that began circulating as a policy, who adopted it, and how was it adopted it, if it even was adopted? Plaintiff reprinted on pages 11-14 of his Complaint the <u>exact document that began circulating</u>. It bears no indicia of its pedigree, such as how enacted, who signed, proof of passage, or any indicia that it is *bona fide* policy. Is this the vaccine mandate the City Council voted on noted in Defendants' Motion? Dkt. 11 at 11. Normally, City policies are signed by an executive or department head, are on policy head, contain enactment dates and versions notices, or like hallmarks of passage. Here, Plaintiff avers the words reprinted on Complaint 11-14 are the exact "policy" purporting to be City policy. *Ciseneroz* did not raise this argument and apparently only made the argument that the City cannot adopt a vaccine mandate. *Id.* at *4. *Troogstad*, too, just noted that the City voted to keep its vaccine mandate. *Id.* Plaintiff avers that

---

[5] This fact is not in the Complaint; however, Plaintiff may suggest facts outside the complaint. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010). The Policy also references non-disciplinary, no-pay status, so this fact is consistent with the pleading. Dkt. 1 at 13 (Section VII(D)).

this "Policy" is void under Illinois law, unless the City can show it has a valid pedigree and was validly enacted.

A review of City Ordinances outlines certain requirements and the scope of authority of City officials. For example, Section 2-4-040 of the Chicago Code of Ordinances requires that the Mayor sign "other written instruments" where otherwise required to do so in the Code. If this is a Mayoral policy, where is signed version? Section 2-12-010 provides that the City Clerk shall "[d]eliver without delay to the mayor all ordinances or resolutions in his charge which may require to be approved or otherwise acted upon by the mayor." Section 2-36-200 states the authority of the Fire Commissioner, and nowhere does it authorize such person to adopt a COVID-19-related employment policy. If this is a Fire Department policy, under what authority did the Fire Department enact it? If it is a Health Commissioner policy, the Code says the Commissioner must have a public hearing with notice and comment requirements. *See* 2-112-070(a). If an emergency rule, "as soon as practicable after promulgation, such emergency rules shall be published on the Department's public website with notice that they are in force in the City." *See* 2-112-070(b)[6]. But is it even a Health Department Policy? If it is an HR Policy, where were the provisions of Section 2-74-050 followed?[7]

In candor, on January 10, 2024, the City filed a Reply Brief in *Tebbens v. Chicago*, 23-cv-00430 that contained this exhibit:

---

[6] A diligent search of the Department of Health's website does not reveal this policy anywhere on it.
[7] The Human Resources website does not list this document as a policy: https://www.chicago.gov/city/en/depts/dhr/supp_info/human_resource_policies.html (accessed 11/29/2023). The latest posted version of the Personnel Rules is dated September 10, 2014. *See https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf (accessed 11/29/2023).*

**DEPARTMENT MEMO**        <u>M-110-21</u>

October 12, 2021

**SUBJECT: CITY OF CHICAGO COVID-19 VACCINATION STATUS REPORTING REQUIREMENT**

On Friday, October 8, 2021, all City of Chicago employees received the City's updated <u>Covid-19 Vaccination Policy</u> via City email. The **vaccination status reporting provision** of the City's policy applies to **all** Chicago Fire Department sworn members and civilian employees, who **must** report their current vaccination status via the <u>City of Chicago Employee Vaccination Portal</u> *no later than* **Friday, October 15, 2021.**

Please note that **all CFD member**s who are currently fully vaccinated, in the process of completing a multi-dose vaccine regimen, or unvaccinated, **must** report their current status via the City portal by this Friday. Please note that CFD has not provided any employee vaccination information to the Department of Human Resources, therefore all members who were vaccinated by CFD vaccination teams earlier this year must also complete the Employee Vaccination Portal.

The complete Covid-19 Vaccination Policy is available on SharePoint via the link above. Employees will be notified of any changes or updates to the City of Chicago policy.

**APPROVED:**

*Annette Nance-Holt*

**Annette Nance-Holt**
**Fire Commissioner**

**TO BE READ AT FOUR (4) ROLL CALLS AND POSTED**

**Distribution: A**

*Tebbens*, 23 C 00430 at Dkt. 68-1. While this is helpful to understanding this Policy, it doesn't answer these questions: Section 2-36-200 states the authority of the Fire Commissioner, and nowhere does it authorize such person to adopt a COVID-19-related employment policy. If this is a Fire Department policy, under what authority did the Fire Department enact it? If it is a Health Commissioner policy, the Code says the Commissioner must have a public hearing with notice and comment requirements. *See* 2-112-070(a). If an emergency rule, "as soon as practicable after promulgation, such emergency rules shall be published on the Department's public website with notice that they are in force in the City." *See* 2-112-070(b)[8]. But is it even a Health Department

---

[8] A diligent search of the Department of Health's website does not reveal this policy anywhere on it.

Policy? If it is an HR Policy, where were the provisions of Section 2-74-050 followed?[9] So, even the best evidence the City has managed to pony-up in response to this claim (above) does not answer the pedigree problem, and this claim should proceed to discovery. Think of the problem this way: let's say a guy on the street wrote the Policy, gave it to Nance-Holt, and then she sent the above memo. Does that make it a valid policy? Further, shouldn't it really be the Department of Health, with the presumed expertise in COVID control, that is writing and passing such a policy? Nance-Holt is no doubt an expert in firefighting – but COVID control? Thus, the pedigree problem persists.

And there are legal consequences to improper passage for the "policy" is void, if Plaintiff's concerns about it prove correct, and then his termination is certainly "void." Under Illinois law, "[i]t is the general rule that when the legislature grants to a municipal corporation power to do any act and prescribes the manner in which the power shall be exercised, the power must be exercised in the manner stated and not otherwise." *Gray v. W.A. Black Co.,* 338 Ill. 488, 170 N.E. 713, 716 (1930) (holding ordinance that did not strictly conform to the requirement of the Local Improvement Act void); *see also Booth v. Corn Products Co.,* 9 Ill.App.3d 433, 292 N.E.2d 149, 152 (1972) (holding the Sanitary District, absent an ordinance providing for compensation, lacked the right to seek compensation for the handling of excess discharge); 2A *McQuillin's Law of Municipal Corporations* § 10.27, at 391 (3d ed. 1996) ("Where the applicable law directs in precise or definite terms the manner in which certain corporate acts are to be executed, and points out the departments, officers or agents who are to perform them, such specification must be substantially followed...The direction of

---

[9] The Human Resources website does not list this document as a policy: https://www.chicago.gov/city/en/depts/dhr/supp_info/human_resource_policies.html (accessed 11/29/2023). The latest posted version of the Personnel Rules is dated September 10, 2014. *See https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf (accessed 11/29/2023).*

definite and certain method of procedure in the grant of power to municipal authorities generally excludes all other methods by implication of law.").

Finally, there is the matter of Judge Moreland's ruling[10]. Unfortunately, that ruling solves no problems here because Judge Moreland simply hangs her hat on the Illinois Public Labor Relations Act's provision that collective bargaining agreements supersede ordinances at 5 ILCS 315/15(a)-(b). That ruling answers none of the questions set forth above about who passed this document, who wrote it, who signed it, what department handled it, etc. Defense seems to say "it doesn't matter because IPLRA trumps all that." The first problem with this is that the City does not attach the "arbitrator's decision" referenced in Judge Moreland's ruling, so we really do not know if it says that the City has authority to adopt this policy. Assuming it's the George Roumell award[11], it is not clear that the arbitration award does excuse the City from following its ordinances in passing a policy. In that arbitration, the City argued that it could pass the policy under the Management Rights Clause of the union contract, and it had no obligation to bargain with the union over it. *See* Ex. 1 at 14-15. The Arbitrator agreed, the passage of the policy was within Article 4, the Management Rights Clause, stating:

> Having concluded that the medical evidence on this record supports a vaccine mandate, that the issuance of a vaccine mandate was within management rights pursuant to Article 4, and that there was no legal impediment to the issuance of the vaccine mandating, the question remains concerning the nature and scope of the award to be issued by this Arbitrator. The Policy

*Exhibit* 1 at 32. Arbitrator Roumell luckily reprints Article 4 for us, as follows:

---

[10] A Notice of Appeal was filed in *Chicago Firefighters Union, et al. v. City of Chicago*, 2021 CH 05715 (J. Moreland) on March 3, 2023, and there is no ruling from the First District Appellate Court yet.
[11] A copy can be found here: Chicago-Police-Unions-Covid-Opinion-02.23.22.pdf (lris.com) (accessed January 12, 2024). A copy is also attached hereto as Exhibit 1.

Article 4/Management Rights

The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. The rights reserved to the sole discretion of the Employer shall include, but not be limited to, rights:

A. to determine the organization and operation of the Department of Police;
      * * *
C. to set standards for the services to be offered to the public;
D. to direct the Officers of the Department of Police, including the right to assign work and overtime;
      * * *
J. to add, delete or alter methods of operation, equipment and classifications;
      * * *
N. to add, delete or alter policies, procedures, rules and regulations.

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provisions of this Agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this

9

*Exhibit 1* at 9. So, reviewing the Roumell Award and the Management Rights Clause, actually what happened is that the City's enactment of the Policy fell *outside* the scope of the collective bargaining process governed by the Illinois Public Labor Relations Act – it was determined to be a matter of Management Rights. What happens then? Well, the City still has to follow the Municipal Code for policies falling outside the collective bargaining process. Otherwise, any time the City passes a policy it can claim it does not have to follow the Municipal Code in so doing because it falls within "collective bargaining," and yet it can claim it does not have to negotiate the same policy with the Union because it was passed as part of "Management Rights" under the union contract. This creates a "policy black hole" where the City can adopt a policy without following the Municipal Code and without bargaining it. And that is actually what happened in this case – the City did not

14

bargain it because it was Management Rights, and it also did not follow the provisions of the

Municipal Code in passing it (if it passed it).

A dive into traditional labor helps explain why the City has to follow the Municipal Code

with this Policy, *especially* given Arbitrator Roumell's ruling. In *How Arbitration Works*, the "reserved

rights" doctrine is explained in detail as follows:

> "[T]he underlying premise of collective bargaining agreements is that management retains all
> rights of a common law employer which are not bargained away or limited by the collective
> bargaining agreement. The parties commenced their negotiations from a position where
> management enjoys all rights of a common law employer. That is, it is free to set the
> conditions of employment in any manner it desires without any limitation, except those
> imposed by law. The employee's options are to either accept or reject employment upon those
> terms. In collective bargaining the employees withhold or threaten to withhold acceptance of
> employment unless the conditions of employment are modified in the respects successfully
> bargained for. <u>Where the collective bargaining agreement does not modify or limit
> management's prerogatives, management retains the prerogatives of a common law employer.
> The significance of the silence of a collective bargaining agreement upon a subject matter is
> that management retains its common law rights toward that subject matter which it has not
> bargained away.</u> The Union argument presupposes the Employer must have contract authority
> to take a particular action. In fact, the converse is true, and the Union must show that a
> particular act of management was contrary to contractual limitations placed upon management
> or obligations imposed upon management by the contract."

Elkouri & Elkouri, *How Arbitration Works*, 203, Sanders and Kennedy, (8th ed. 2020)

(emphasis added). Elkouri mentions that the United States Supreme Court, indeed, has endorsed

this view of "reserved rights" in *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584, 34

BNA LA 561, 565, 46 LRRM 2416 (1960). *How Arbitration Works* at 626, FN8. How this shakes out

for this case, then, is very simple: the City retained its right to pass the COVID policy according to

Arbitrator Roumell as the Policy fell within the Management Rights Clause. Therefore, collective

bargaining does not apply to the Policy as a "reserved right," and the City had to follow the

Municipal Code just like it must with any other Policy it adopts among its "reserved rights."

Unfortunately, the Union's Response Brief in the Moreland case did not argue any of these points.

*See* Exhibits 2 (City's Motion) and 3 (Union's Response). Because the City did not follow the

Municipal Code, though, the Policy, and Plaintiff's termination, are "void" as in, for example, *Gray v. W.A. Black Co.,* 338 Ill. 488, 170 N.E. 713, 716 (1930).

Accordingly, Plaintiff's argument that the City failed to follow the Municipal Code should live on to discovery.

### IV.     Plaintiff Has Stated A Viable IRFRA Claim.

Defendants' arguments as to IRFRA mimic those on Free Exercise and Equal Protection and, therefore, Plaintiff incorporates his arguments against those here. The Defendants do claim that Plaintiff has alleged no less restrictive means, which is not true, he does so at Dkt. 1 at ¶78.

### V.     The Tort Immunity Act Does Not Bar Plaintiff's Claims.

Defendants next argue that Section 6-104 of the Tort Immunity Act applies because the termination was discretionary and for the purpose of "preventing disease or controlling the communication of disease within the community." Dkt. 11 at 13. They claim the City's development and implementation of the vaccination policy "served the purpose of preventing disease and controlling COVID-19 within its workforce." Dkt. 11 at 14. They cite a Circuit Court of Cook County ruling, *Joiner, et al. v. The City of Chicago*, 2022 L 3085 (Feb. 24, 2023, J. Roberts) (*Joiner*). Dkt. 11 at 14, 14-1.

*Joiner* is distinguishable. First, the plaintiffs there brought claims under the Illinois Health Care Right of Conscience Act and the Illinois Freedom Restoration Act. Dkt. 14-1 at 1. Second, those plaintiffs tried to argue they could not complete the portal requirement because there was no option for them to select if they were unvaccinated religious objectors, which was contradicted by their own exhibit, and, thus their own legal theory was shot by their own exhibit, and the Court dismissed their claims. Dkt. 14-1 at 3. Third, those plaintiffs attempted to argue that Section 6-104 are constitutional claims, which the Court rejected because the Tort Immunity Act can bar constitutional claims in some instances. Dkt. 14-1 at 4. Plaintiff has four counterarguments here: (i)

16

TIA does not bar the equitable claims in this suit, such as for back pay, (ii) Section 6-104(b) says immunity only attaches if "due care" is used, (iii) Plaintiff's termination was not truly a disease prevention measure, and (v) IRFRA claims are only ever against the government and, therefore, it is absurd to interpret it as not to allow damages.

    1.   <u>Equitable Relief Is Not Barred By TIA.</u>

According to a Westlaw search conducted the week of January 12, 2024, there is very little case law interpreting section 6-104, and Defendant cites none specifically citing it except the *Joiner* order. Judge Shah, though, recently dealt with it in *Schneider v. City of Chicago*, 22 C 1031, 2023 WL 8019434 (N.D. Ill. Nov. 20, 2023). In that case the plaintiffs brought, *inter alia*, and IRFRA claim and the City claimed that TIA, including Section 6-104(a), provided the City immunity from such a claim. *Id.* at *4. However, Judge Shah reasoned that while such statute would likely be interpreted by the Illinois Supreme Court to bar "damages" under IRFRA, the Court further reasoned that "the ITIA can be read in concert with IRFRA to state that local governments are immune from damage claims, but not claims for injunctive or other forms of relief authorized by IRFRA." *Id.* He cited 775 ILCS 35/20 as stating that "[i]f a person's exercise of religion has been burdened in violation of this act, that person . . . may obtain appropriate relied against a government." *Id.* What this means for Plaintiff Valle in this case is that, even if the Court holds that TIA and section 6-104 bar damages (which is should not per the next argument), it does not bar his claim for reinstatement, back pay, back benefits, attorneys' fees, and all other relief sought except for damages. *See* Dkt. 1 at 37, 52, 81. 745 ILCS 10/2-101. Many cases hold that claims for back pay, for example, are claims for equitable relief not barred by TIA. *See, e.g.*, *Stringer v. City of Lake Forest*, 16 C 8991, 2017 WL 75741, at *1 (N.D. Ill. Jan. 7, 2017); *see Vill. of Thomson v. Ill. Human Rights Comm'n*, 2016 IL App (2d) 160011-U, ¶70, 2016 WL 6903900, at *11; *see Kirley v. Bd. of Educ. of Maine Twp. High Sch. Dist. 207*, No. 13 C 1706, at *12 (N.D. Ill. Dec. 20, 2013) (citing *PACE, Suburban Bus Div. of Reg. Transp. Auth. v. Reg.*

*Transp. Auth.*, 346 Ill. App. 3d 125, 143, 802 N.E.2d 13, 29 (2003)). The Motion should, therefore, be denied as to the TIA to the extent the counts seek equitable relief of these varieties as to all Counts.

    2.   <u>Damages Are Not Barred Because Of Section 6-104(b)'s "Due Care" Language.</u>

But *Schneider* itself cites no case interpreting Section 6-104, either, so we need to examine the statutory language as a whole to see if the damages claim is really subject to immunity at all:

"§ 6-104. (a) Neither a local public entity nor a public employee is liable for an injury resulting from the policy decision to perform or not to perform any act to promote the public health of the community by preventing disease or controlling the communication of disease within the community if such decision was the result of the exercise of discretion vested in the local public entity or the public employee, whether or not such discretion was abused.

(b) Neither a local public entity nor a public employee is liable for an injury caused by an act or omission in carrying out **_with due care_** a decision described in subdivision (a)."

745 ILCS 10/6-104 (emphasis added). Section (b) was not discussed in *Schneider*, and it sheds interesting light on Section (a). Plaintiff, in this case, alleges that he was terminated for violating the same policy from which he was exempted as a whole. Dkt. 1 at ¶20-22, 27, 29, 35, 47. If true, that is not "due care" by the City, but arbitrary, sloppy, mistaken, and overreaching action. Section 6-104 is admittedly a strange law because in Section (a) it says "whether or not such discretion was abused," but then states in Section (b) "carrying out with due care." As the Court must give effect to all words and phrases in the statute, the way Plaintiff sees to harmonize these two statutes is to focus on the phrase "policy decision" in Section (a) and "in carrying out with due care a decision" in Section (b). Plaintiff's view is that the City's is immune in its decision to adopt the vaccination policy in and of itself by Section (a), but in applying the policy – "carrying out with due care a decision" – the City is not immunized if it carries out is policy without due care.

There are three other cases on Westlaw dealing with Section 6-104, *Missey v. City of Staunton, Illinois*, 2008 WL 4911877 (C.D. Ill. 2008), *Taylor v. Bi-County Health Department*, 2011 IL App (5th) 090475 (5th Dist. 2011), and *Michigan Avenue National Bank v. County of Cook*, 306 Ill.App.3d 392 (2d Dist. 1999). *Missey* does not discuss Section (b) at all and was about drinking water regulations. In

*Taylor*, the plaintiffs actually made the argument Valle makes here – Section (b)'s "due care" language means the government could not negligently administer vaccines. *Taylor* at ¶17. But *Taylor* unfortunately stops short of ruling on that argument and grants dismissal on other grounds. *Taylor* at ¶50. *Michigan Avenue National Bank* held that Section 6-105 provides immunity for inadequate mental or physical examinations, and never references Section (b) or "due care." *Id.* at 401. But the dissenting opinion in *Michigan Avenue National Bank* contains great language for Plaintiff here about Section 6-106(b) of TIA, which also contains "due care" language. This is key and worth reprinting:

"As section 6–106(b) plainly states, an immunity is granted only when medical treatment is being 'administer[ed] with due care.' 745 ILCS 10/6–106(b)(West 1996). Additionally, subsections (c) and (d) each begin with the language '[n]othing in this section exonerates.' 745 ILCS 10/6–106(c), (d) (West 1996). The insertion of such language by the legislature is a clear indication that subsections (c) and (d) were meant to further refine and limit the immunity set out in subsection (a). ** In light of the above, it is clear that section 6–106(a) was not meant to grant a blanket immunity for negligent treatment of a specific medical condition. 745 ILCS 10/6–106 (a) (West 1996). In the instant case, each of plaintiff's experts was of the opinion that had Cynthia Collins received the treatment she was denied, the likelihood of her recovery would have increased. Here, the admitted evidence with respect to whether local public entities and their employees negligently treated a specific medical condition gives rise to a material question of fact. Since an issue of fact existed, the majority errs in affirming the trial court's judgment granting defendant's motion for summary judgment."

*Michigan Avenue National Bank v. County of Cook*, 306 Ill.App.3d 392, 410 (2d Dist. 1999) (cleaned up). One final point about Section (b). "Due care" seems to be its entire upshot. Without that "due care" language, Section (b) says the exact same thing as Section (a). So, the "due care" language is the "words of import" within Section (b) and it is especially important that we do not ignore them because, if we do, we negate the entire Section (b).

    3. <u>Plaintiff's Termination Is Not A Disease Prevention Measure.</u>

Next, for Section 6-105 to apply, there must be a "policy decision to perform or not to perform any act to promote the public health of the community by preventing disease or controlling the communication of disease within the community." 745 ILCS 10/6-104. Plaintiff concedes that elements of the vaccination policy fall within this area, but, however, how does termination of the

Plaintiff "promote the public health of the community by preventing disease or controlling the communication of disease within the community"? It is not like this policy exiles him from Florence to Venice, kills him, or quarantines him. Nor does it prevent him from going to the gas station, the shopping mall, to get groceries, or anywhere else in the community. So what is this "termination" part of the policy really doing that "prevent[] disease" or "controls the communication of disease"? Well, Plaintiff means to say in this suit that it does not do that. It is an arbitrary and vindictive action by the government having nothing to with disease prevention or control. While TIA is usually decided as a matter of law, this is really an issue for discovery in this case to learn what the purpose was of this termination at this very late date?

4.  <u>IRFRA Claims Are Only Ever Against The Government; Therefore, How Can No Damages Be Available?</u>

The last argument applies to TIA against damages under the IRFRA claim in Count 4. IRFRA states that "[i]f a person's exercise of religion has been burdened in violation of this Act, that person may assert that violation as a claim or defense in a judicial proceeding and may obtain appropriate relief against a government. A party who prevails in an action to enforce this Act against a government is entitled to recover attorney's fees and costs incurred in maintaining the claim or defense." Here's the thing: the only Defendant that such a claim can ever be brought against if the government, and IRFRA practically becomes toothless if governments are immunized from damages. Valle's case, of course, carries equitable relief anyway, but what about an IRFRA claim brought by a non-employee plaintiff? How about this example: the government passes a law requiring the Seventh-Day Adventist Gifts And Books to close on Sundays. Seventh-Day Adventist Gifts And Books' owner is adamant that her shop should be able to remain open since she worships on Saturday, and does not want the government telling her to shut down on Sundays. She feels the law is an attack on Seventh-Day Adventism. Her shop is obviously damaged by this – it loses business on Sundays. Can it not get damages for lost business because of this government law

requiring it to be closed? Defense will probably say she can get injunctive relief and, sure, she can get that, but what about the business losses for the two Sundays it remained closed while the injunction was being decided? Can it not get those? The upshot here is that it is simply absurd that Illinois would pass IRFRA – which by its very nature involves claims against the government – authorize civil actions against the government for its violation, but then intend that the TIA bar damages. Take another hypothetical: the government passes a law requiring churches to close on Sunday. Tom Smith is a devout Christian who has never missed a Sunday in church. Because of the new law taking effect on January 13, 2024, he is prevented from going to church on January 14, 2024 because it is closed. Tom has a lawyer who sued for injunctive relief , but there's no way for the court to act in time to keep the church open on Sunday. Tom is immensely distressed that he will miss church on Sunday. What's his remedy here if damages are not available? The government just did something that really damaged his religious beliefs and distressed him. He can't damages for it because of TIA?

Case law supports this view, too. Courts regularly refuse to apply the TIA to statutes providing exclusive relief against the government. *See, e.g.*, *Schultz v. St. Clair County*, 2022 IL 126856 (2022). Otherwise, the statute would tell the government what to do, but provide few repercussions for failing to do it. *Moncivaiz v. DeKalb*, No. 03 C 50226, 2004 WL 539994, at *3 (N.D. Ill. 2004) (finding it unlikely that the legislature intended to immunize a government for a statute creating causes of action against the government); *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973) ("The district court erroneously relied on the Illinois Tort Immunity Act. Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. *See McLaughlin v. Tilendis*, 398 F.2d 287, 290 (7th Cir. 1968). The immunity claim raises a question of federal law.").

21

The above hypotheticals present absurd outcomes, and, due respect to Judge Shah's ruling in *Schneider*, it is highly dubious that the Illinois Supreme Court would bar damages claims under IRFRA given the very nature of the law. Indeed, several of the arguments raised in this Response were not raised in *Schneider*, so Judge Shah was handcuffed by the briefing.[12] *See Schneider* at Dkt. 25. This Court should feel free to depart from *Schneider* and find that TIA does not bar Plaintiff's claims for damages in this case.

**VI.      The Individual Defendants Are Not Entitled To Qualified Immunity.**

Defendants change the facts of this case in making their qualified immunity argument. Defendants read Plaintiff's exemption request too narrowly as only covering the vaccination, when, in fact, (i) the religious principle Plaintiff cites applies to all aspects of the COVID policy, (ii) that the Determination Notice exempts Plaintiff from the policy as a whole, not from piecemeal requirements, (Dkt. 1 at 4, ¶21), and (iii) Defendants fired Plaintiff for violating the same Vaccination Policy they exempted him from. Dkt. 1 at 4, ¶22 (citing the Vaccination Status Reporting requirement as a basis for the discharge). More to the point, it is not the institution of the COVID Policy that is in issue in Counts 1 and 2, but rather the application of the policy to Plaintiff to fire him for not complying with the Policy when he had already been exempted from it. Defendants' qualified immunity argument is based upon the City's adoption of the Policy itself, which is not at issue in Plaintiff's challenges in Counts 1 and 2.

On an as-applied basis, Defendants' qualified immunity argument fails because the law was clearly-established as of October 25, 2022 when Defendants fired Plaintiff that the government may not adopt a policy allowing for individualized exemptions, but then refuse to extend such

---

[12] The plaintiffs in *Schneider* did make this latter argument about *Schultz* and *Moncivaiz*. *See Schneider* at Dkt. 25 at 5-6. *Schneider*'s ruling does not address the argument, which is strange because it presents a really compelling question: why even have IRFRA if you can't get damages? *Schneider* at Dkt. 25.

exemptions to cases of religious hardship. *See Lukaszczyk v. County of Cook*, 47 F.4th 587, 607 (7th Cir. 2022) (citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 884 (1990)); *see also Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. ----, 141 S.Ct. 1868, 1878-79 (2021) ("We have never suggested that the government may discriminate against religion when acting in its managerial role."). Defendants will probably rejoin that they did allow religious exemptions, which, sure, that is true, but then they fired Plaintiff anyway for violating the Policy that his very exemption covered. As applied to Plaintiff, Defendants might as well have denied his exemption and fired him for not complying. If any of these COVID as-applied challenges run afoul of the free exercise clause, surely this is it.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion.

Respectfully submitted,

**MARCELLO VALLE**

By: */s/ Cass T. Casper*

_____

His Attorney

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: ccasper@dispartilaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 12, 2024 he caused to be served the foregoing document on all counsel of record via this Court's CM/ECF filing system, and that all such counsels are registered e-filers.

By: */s/ Cass T. Casper*

_____

His Attorney